May it please the Court, Elizabeth Rogers on behalf of Karen Ann F. Kelley. This case, although some of the facts are complicated, is a simple case in which the District Court improperly usurped the jury's role. The District Court granted a Rule 50 motion at the close of Ms. Kelley's case, precluding the jury from considering whether or not her employer, the County of Orange, had improperly discriminated against her on the basis of her religion. The record is---- RAYLOR, O.H.: All right. Now, I'm sure you know the test is, right, whether there is sufficient evidence to support a jury verdict if the jury so decides so. Now, what's the evidence that you think made it erroneous for the District Court to take that action? TAYLOR, PTSI NUNINGHAM CO governee,onstance.com, 213inatoria, 5211161 The first, Your Honor, let me explain the theory under which a substantial evidence would be applicable. The theory would be that the county failed to reasonably accommodate Ms. Kelly's religious conviction that precluded her from counseling minors to have abortions or to use contraception. There is ample evidence that for the first two months that Ms. Kelly worked as a nurse in Juvenile Hall, before she was asked to do these things, there were no complaints about her performance. In October of 1993, two months after she had been employed as a nurse at Juvenile Hall, she was asked to attend an HIV training class and to do these things. And that's when the evidence of alleged performance deficiencies started. So the first piece of substantial evidence would be that the fact finder was free to infer from the course the county took that they, as soon as she expressed this religious conflict, they started to launch a crusade to find grounds to fire her. Well, I said a crusade when they, you know, gave her the transfer she asked for. She actually did not ask for that transfer, Your Honor. Well, she asked for accommodation, didn't she? Yes. And she accepted it without protest, didn't she? No. What was her protest? Did she say, no, it's not sufficient? All she said was, well, the hours are too long, I want to cut down, and they give that to her, right? That's not – a juror could find otherwise, Your Honor, a reasonable juror. First of all, there's testimony that she did object to the transfer. If you turn your attention to Volume 4 of the excerpts of records submitted by Ms. Kelly at pages 161 to 163, there's testimony in which she explained that she did object to being transferred to the night shift at Orangewood, which was a facility. Is that because of her child care? Did she say that at the time? I believe that that was one of the grounds for this objection. But let's step back a moment. The accommodation she requested was to remain employed at Juvenile Hall and not have to tell kids that they should use condoms and that they should have abortions. And there really isn't evidence that that wouldn't have been a reasonable accommodation. Well, but you don't – as I understand the reasonable accommodation law, if they make a – if they make an accommodation, then it needs to be determined whether it's reasonable. That doesn't mean you necessarily get to pick your accommodation. Do you agree with that? Yes, Your Honor. That's correct. So it doesn't mean she could pick to stay at Juvenile Hall, although that was her preference. It seems to me that what we have to benchmark this evidence against is are there enough inferences that the accommodation they did give her wasn't a reasonable accommodation? I think that that's correct. And if a jury could find that instead of giving her a reasonable accommodation, they transferred her to a position they knew she wasn't qualified to do, they failed to give her an orientation there, and they wanted her to make an error sufficient to allow them an excuse to get rid of her. So now you're – this really does focus on the second job. Yes, Your Honor. The argument is that in transferring her to that job, the county says that that was a perfect accommodation or a reasonable accommodation. Ms. Kelly's position, and one that I believe is supported by the evidence, is that that wasn't an accommodation at all. It was – there is evidence – It was a setup. Yes. They set her up to fail. Okay. What is the evidence that they set her up to fail? Your Honor, the – one, as I mentioned, is the documentation of alleged performance deficiencies doesn't start until December. There is a memorandum in the record in December 16th of 1993, and Volume 2 of this is the county supplemental – actually, the county supplemental appendix at pages 63 through 66. That memorandum is dated December 16th, 1993. It's the first documentation of any problems with Ms. Kelly's performance. And it's – Now, that's before she went – that's before she went to Orangewood, though. It is. But that happened right after she filed her grievance with the county's Affirmative Action Committee. So that's evidence of – that would be evidence that a jury could consider. Well, but it – given that she's filed a – given that she's filed a complaint, why isn't it also a natural response on the part of the county to say, she's filed a complaint, and we're going to have to be more careful if we're unhappy with her? And so if we're unhappy with her performance, she's in a probationary period, she has one year, they can fire her, and she's nearly an at-will employee. Why isn't that a very natural response on the part of the – on the part of the county to say, if we're unhappy with her, we're going to have to be very careful because we know that she's already – that she's already complained about us. So we're going to have to document every – all of – anything that we're unhappy with her about. Your Honor, a juror might well have found that it was a reasonable response and that there – and might not have accepted, ultimately, that it was evidence that they were setting her up to fail and transferring her to a position for which their own documents indicated she was underqualified to perform. They may have accepted the argument you just articulated. The error that happened here is that they weren't given the chance. Okay. But at some point, you've got to have something that would demonstrate that the county had evil in its heart. And it's not just – it can't just be the fact that they're documenting – that they're documenting things because that is what employers do. So what – what evidence do you have that the county had evil in its heart? Ms. Kelly testified that two of her supervisors, her immediate supervisor and the – This is when and where? In – this is in the record. No, no, no. At what facility and at what time, what date? This is in the fall of 1993, before the transfer to Orangewood. Correct. Now, two supervisors did what? Threatened to fire her because she wouldn't engage in the contraceptive teaching that they required. The county has said that Ms. Kelly's testimony – This is Ms. Williams and Ms. Mosley? Yes, Your Honor. Okay, but this is – this is prior to her filing her complaint, right? The record is somewhat unclear about when the second threat took place, whether it was after the complaint or not. So the testimony, as I understand it, is that these threats occurred in late October through November of 1993, and her grievance was filed at the end of November of 1993. So I'm not sure. This is Williams and Mosley. Prior to the accommodation, which I thought you told us was the evidence that she was being set up. Remember, Your Honor, the question is, was the transfer to Orangewood an accommodation or was it a set-up? And these conversations in which her two supervisors, she says, threatened to fire her because she wouldn't engage in the teaching, that is substantial evidence. A jury could have believed Ms. Kelly's testimony that her supervisors said, you know what, if you don't engage in this teaching, we're going to get you. And that ultimately they did. The county would like to have you believe that because it's Ms. Kelly's testimony and it's self-serving, that you can't credit it. But that's exactly the point. The jury should have been able to decide whether they believed Ms. Kelly, that her supervisors said, if you don't do this, you're out of here, or whether they believed her supervisors, who, of course, denied having threatened to fire her because of her religious beliefs. And so the evidence of what happened before the transfer to Orangewood is probative of whether ---- But given her probationary state, could the county reasonably say, as a county, we have made a determination at this juvenile facility that we are going to teach teenagers about HIV and to encourage them to use condoms in addition to whatever programs we have regarding abstinence. And if you as an employee are unable to do that for whatever reasons, then you are not, then you may not work at this, continue to work at this facility. That would have nothing to do with religion, would it? They would not be free to do that unless it were absolutely an undue hardship to fail to accommodate. That has nothing to do with accommodation. I'm saying, when you come to work at this facility, at the juvenile hall, one of the things that our nurses do at the juvenile hall is that they counsel people, they counsel juveniles regarding appropriate sexual behavior and how to avoid the risks of HIV. If you are not willing to do that, which we as a county have decided to do, then you may not work as a nurse at this facility. And if you are unwilling to do that, then you are no longer qualified to be a nurse here and we would have to fire you. Now, that doesn't have anything to do with religion, does it? Well, neither does requiring people to work on Saturdays, unless you are a Saturday sabbatarian. So I think the point is, Your Honor, that you haven't brought a religious, you haven't brought anything under RLUIPA. I mean, you haven't brought a claim of, you brought a Title VII claim. You're not claiming that she's got a free exercise claim here. But similarly, my point, Your Honor, is merely that, of course, employers can have requirements for the job, and one of those requirements, similarly, could be that you have to work on Saturdays. And that's a fine, that's, there's no problem. But I'm challenging the county's policy that it cannot issue that as a job requirement for working at Juvenile Hall. I would like to point out, though, that they didn't tell, there's testimony that they didn't tell her that this was the deal before she signed up for the job. So I do think there would be evidence based on which a jury might not believe that that was, in fact, the case. You know, might reject that that was actually their policy or that they had a need for every nurse employed at Juvenile Hall to be able to give that training. I, you know, so I do think there are some factual disputes over whether that, in fact, happened here. But if that were the case, then Title VII would still require the employer to accommodate the religious beliefs of an employee for whom that policy created a conflict, unless the employer could demonstrate that it would be an undue hardship to provide an accommodation. So I think in this case, you know, the jury could have found that the accommodation that she requested, which was to remain employed at Juvenile Hall and not have to engage in this counseling, would have been reasonable. And the fact that instead of giving that, there's testimony that her supervisors threatened to fire her, they transferred her to a facility where she maintains she wasn't given an orientation. There's the – Your Honors had also asked what other substantial evidence is there about the transfer being actually a setup. Well, Karen Adams, Ms. Kelly's supervisor, at pages 14 and 15 of Volume IV of the Excerpts of Record, testified that Ms. Kelly had received an orientation, but that she had destroyed the records of that orientation after learning – a few weeks prior to learning of the lawsuit. A reasonable juror could conclude that there were no records of an orientation because Ms. Kelly was correct. She wasn't oriented toward – properly at Orangewood. And so the record does contain evidence on which a reasonable juror could conclude that this wasn't an accommodation at all. It should be the province of the jury to make this decision. It shouldn't have been the province of the district court judge. Title VII doesn't require that an employer merely refrain from firing you because of your religion. It requires that the employer not discriminate against you based on the terms of your employment. And then in the section that defines religion, the statute includes all aspects of religious observance unless an employer can demonstrate that he's unable to reasonably accommodate those beliefs and practices without an undue hardship. So there was enough evidence here to go to the jury on whether or not the county of Orange reasonably accommodated Ms. Kelly's religious beliefs. There's substantial evidence in the record from which a jury could conclude that when they threatened to fire her on the basis of her religion, they were discriminating against her. The fact that she might ultimately have been fired for some other nondiscriminatory reason doesn't alleviate them of the duty to accommodate her during the period that she was employed there. And so if I might use another – going back to the Saturday Sabbatarian example, if someone is employed as a probationary employee for a one-year period and they say, I observed the Sabbath on the Saturday, but their employer requires them to work on the Saturday or lose their job, then if at the end of the probationary period the employee is fired for some other reason or simply let go for no reason at all, there has still been a Title VII violation that the employee could take to the jury. And that's what happened here. You know, she said two of her direct supervisors threatened to fire her because of her religious beliefs. Then they transferred her to a facility where – I want to make sure I understand it. What exactly did Williams and Moseley say? There's conflicting testimony on this point. What did Ms. Kelly say that Williams and Moseley said? Because I've heard you say two different things about what they said. I'd like to be very clear on that. Okay. And I may have, Your Honor, been lax in directly quoting. So I think in – There's a difference between Williams and Moseley saying, we're going to fire you because you won't teach the HIV program, and Williams and Moseley saying, we're going to threaten you because – we're going to fire you because you're Catholic. Fair enough. And I think that it was more the former about whether or not she would teach. And what did Ms. Kelly say that Ms. Williams and Ms. Moseley said? If you turn to page 6 of the reply brief, Your Honor, this is set out in – in quotations, and it's from volume 4 of the record at pages 142 and 143. This is a conversation with Ms. Moseley. And Ms. Kelly testified that Ms. Moseley had said she was a good nurse. I'm paraphrasing a little bit. They were happy to have me there. I needed to take this HIV class and teach it the way the county wanted it to be taught. And I explained to her that I would not do that. And she said, if you don't do that, you will be terminated. And I said to her – And I don't see any indication in there that Ms. Kelly identified herself as Catholic or having Catholic motivation or having a religious reason for not wanting to teach this. She had done that, Your Honor. That's not disputed. And nothing that Ms. Moseley has said that would indicate that she was firing her because – that she would fire her because she was Catholic, only because she wasn't going to teach the HIV course. But remember, Your Honor, the employer is obligated to make a reasonable accommodation. They don't have to have animus toward a religion. Absent undue hardship, they have to accommodate a religious preference. And instead – The whole theory is that when they accommodated her, that they set her up. That they didn't accommodate her. They set her up with this accommodation, that the accommodation was a sham. That they sent her over to Orangewood and put her on a staff for which she was not qualified, didn't give her an orientation, knowing that she would fail and that she would be done. But I'm still struggling to find the evidence that that's why they did what they did. Because the county's theory is, we sent her to Orangewood, we put her in another facility where she wouldn't have to teach this because she was working with much, much younger children. It was the evening shift where ordinarily we had class 2 and class 3 nurses. She was not a class 2 or class 3 nurse. So we were putting her in a staff where ordinarily she wouldn't – she might not have been qualified. On the other hand, she got a pay increase when she was accommodated. But I'm still trying – I'm still struggling to figure out where's the animus on the part of the county? What's the evidence to show that they did this in order to set her up, in order to make her fail? At this page of the record, Your Honor, Ms. Kelly testified that she said to Ms. Mosley, well, then why don't you terminate me right now? And Ms. Mosley said, we can't do that yet, but we will. There's enough evidence here that a reasonable jury could conclude that they covered their acts. Why do they need animus if the test under Title VII is simply was there a reasonable accommodation? That animus, I'm having a little trouble figuring out where legally that comes from. I don't think it's a legal requirement, Your Honor. The statutory text is clear that there's a duty to provide a reasonable accommodation absent undue hardship. And even if the county has the best of intentions in denying an accommodation, that's still a Title VII violation. All right. You've got a minute and a half. You want to reserve it for rebuttal? Yes, please. All right. Let's hear from the county. Good morning, and may it please the Court. Norm Watkins for the county appellees. I apologize for my voice. I was listening to a basketball game last night and got a little exhuberant. In looking this case over, as I see it, there are two issues that appear to be raised here. The first is whether or not there was sufficient evidence, substantial evidence, that the plaintiff produced to permit the Court to find that she had brought forth a prima facie case of discrimination under Title VII. And in order to do that, she has to present substantial evidence, one, that she had a firmly held religious belief, two, that she communicated that to the employer, and three, that the employer threatened to or did take adverse action in a discriminatory way because of that religious belief. Number one and two are not an issue. There is no question in the record that she did produce evidence that she held a firmly – she firmly held religious beliefs, that she communicated them to her employer. Number three, however, is where the case fell apart in the eyes of the district court, and I think it's clear that it's just not here. The record is unchallenged that the plaintiff had a variety of performance problems while she was a probationary employee. The plaintiff didn't even challenge this. There's no question that her supervisors talked to her, told her she was not doing accurate assessments. A doctor, and I can't pronounce the doctor's name, testified that he – maybe it was she. She complained that a child had been admitted to juvenile hall, that the plaintiff did her assessments. Well, I can tell you I agree with all of that. I think it's well supported by the record. But the issue is, is there any evidence on the other side that the jury could have believed to bring a verdict in for the plaintiff? And the plaintiff, Ms. Rogers, has pointed to a number of things, right? One, you know, this comment about we can't fire you now, but we'll get you sooner or later. Two, the destruction of the orientation records, you know, sending her to a job where, you know, you can make an argument that she was not qualified. In other words, why isn't that evidence sufficient to support a verdict for the plaintiff? Well, it's not sufficient because if the description of the requisite evidence as substantial evidence means anything, it's got to mean that it must be something more than merely the plaintiff. And that's what we have here. There's no question. The plaintiff testified. Wait. What are you saying? Plaintiff? No. I think that's actually wrong as a matter of law. In other words, if the jury believed everything the plaintiff said and disbelieved in whole or part the other witnesses, that would be sufficient to sustain a verdict, would it not? Well, no. I think the Supreme Court decisions on how we look at evidence. Well, I think that the district court needs to assess not only that, but whether or not, taking the record as a whole, could a reasonable jury find that the evidence proffered by the plaintiff or that supports the plaintiff's position preponderates? Could that possibly be the case on this record? And it's obviously clear from our briefing, I hope it's clear, that we believe that was not the case. When I look at the evidence, you know, I don't know. I mean, that's just why I'm always granting the motions at this stage is always risky, as you know, although everyone always moves for it and hopes for it. But as Judge Tashima lays out, you know, two or three of the key elements that the plaintiff has presented, the question we come back to that the jury ultimately will be presented with is whether this transfer to this job which she contends that she wasn't oriented to, couldn't do, they were out to get her for anyway, and that they were setting her up, even if she had some job performance problems, was that a reasonable accommodation? And so you, in effect, are asking us literally to determine as a matter of law on this record that it was a reasonable accommodation, are you not? Until this morning, actually, I still believe that the plaintiff concedes that. At page 35 of the brief, it states, quote, Appellant concedes that her transfer to Orangewood sufficiently accommodated her religious beliefs by eliminating the job duty that conflicted with her religious convictions. Now, let's go. I mean, a transfer in and of itself could have been a reasonable accommodation, but the transfer she got under the circumstances she got them and the job she got wasn't reasonable. I mean, that's her claim. Well, I understand the argument. And I believe that what she's talking about, and there's something in the brief and she refers to it as the theory is that the county did not, quote, preserve her employment status. And then she talks about the night shift and the orientation and her, what she felt was her inadequate background. From my perspective, what she's talking about are the incidents of her assignment. She's not talking about her status. She – her status remained the same. She went over there as a comprehensive care nurse. One, that's what she was hired as. She went over there with the same salary and, in fact, it was increased. She went over there and was asked to work nine-hour shifts. She objected, said she only wanted to work eight. She was given the eight-hour shift. What she is quarreling with are incidents of her assignment, which, quite frankly, smack of an afterthought of how can I attack what is clearly an attempt by the county to accommodate my expressed reservations to teach this HIV class. And if the law is, and I have not seen any citation to support this, if the law is that the incidents of – and I'm just using that phrase. It's not anything I've pulled out of a case. That anything in the incident of an assignment is fair game and that renders it an inadequate accommodation under Title VII, then, you know, you're chasing your tail all the time. Because the fact of the matter is the record of overwhelming demonstrates that she failed miserably in her assignment. There's just no question about that. Well, I mean, it may be that, you know, that we have misapprehended her claim then. Because as you're describing it, it's somewhat different. And she's talking about giving herself – getting a transfer that sets her up to fail. So, for example, you couldn't assign her to be a doctor. Correct. Because she doesn't have those – She's not a doctor. So she's saying, well, this is one step down from this. I'm not being assigned to be a doctor. I'm being assigned to be a nurse, but not the kind of nurse that I have training for. So it's a little bit different. So that's how I thought – that's what I thought her claim was. But as I listen to you, maybe you're suggesting that the claim in and of itself was that she just wanted to keep her old job. Well, there's no question. That really hurt. There's no question that's what she wanted. And we know legally she's not – She's not entitled to that. You don't always get what you want. And as a matter of law, she can't necessarily have that. Correct. And then – and the next step in that analysis is she comes to this Court and she concedes, as I think she must, that the transfer that was given to her was a reasonable accommodation. And now the theory is that not – I don't think she concedes it. Well – I heard what you read from her brief, so I need to go back and take a look at that. Page 35. Yeah. Is that the blue brief or the reply? That's the blue brief. That's the counsel's brief. Appellant concedes that her transfer to Orangewood sufficiently accommodated her religious beliefs. And then what does it say? That's page 35. So then the question is, what theory is being advanced? And I studied the briefs very carefully, and I know this Court has, and the theory that jumps out at me is that the county, notwithstanding giving her a reasonable accommodation – it's right at the bottom of the page – that the county, notwithstanding the reasonable accommodation, failed to, quote, preserve her employment status. And that's where I depart and say that all this – all these complaints about the orientation are really complaints about the assignment and how it went. Well, let's explore just a minute her claim that she was sort of superficially accommodated. In other words, it appeared as though she was being accommodated when she was transferred to Orangewood. Yeah, but the schedule's not as good as she would like, and she does get some boost in salary, which makes it look like a very favorable transfer. But she's a class one nurse on a staff that is all class two and class three nurses for the evening. Is she the only class one nurse on that staff? You know, the evidence is murky on that. I'll be candid. As I recall the record, as I recall the trial, the testimony was that the distinction between class one and class two had to do with whether you were on night shift. If you were on night shift, you were automatically designated class two. But she wasn't designated class two. She wasn't designated class two, but that was because she was still on probation. And I don't think that anyone wanted to change her status, especially given the fact that she had had – it was pretty clear that she was struggling. And it wouldn't make much sense to move someone from CCN1 to CCN2 in the face of very substandard performance evaluations that said if you don't pick it up, you're not going to make it through probation. And that is documented. What evidence is there? She also claims that she did not – she had not received sufficient training in dealing with children to qualify her to work at Orangewood, perhaps something that she didn't realize until after she got over there. What evidence is there in the record about the training of the other nurses on that staff? None. Other than her testimony that she didn't feel she was adequately trained. She acknowledged that she had pediatric training in nursing school. And, again, her supervisors testified that she was adequately trained and that she had the skills for the assignment. I'm now looking at her brief to see if I missed something, and what she says is that her transfer accommodated her religious beliefs, which is true. In other words, if you move her over here, she doesn't have to do counseling. So she's saying it accommodated her religious beliefs, and then she follows that in her brief with the postal workers case, which she focuses on. But then the next question is whether the accommodation reasonably preserves the affected employee's employment status. Correct. So that's really what we're talking about. That's right. And those are the issues Judge Bivey just brought up about the, you know, the night shift, the training, that sort of thing. And we have conflicting testimony on this, correct? Well, I'm not sure that it's conflicting. We have the plaintiff's testimony that she didn't like any of this. There's no question she was on the night shift. There's no question that she, in her supervisor's view, she did receive orientation. Well, but she says, I guess the question we have to figure out is whether there's enough to say that her employment status wasn't preserved because she says it was inappropriate for CCN1 to be on the night shift, plus she didn't want the night shift because of her child care. And then she goes on, and I don't know if it is or not, but if she testifies to that and puts on evidence to that, saying that there was no other employee in that position, isn't that enough for the jury to infer that in her favor, at least at this point? Well, no, I don't think so because I don't think when we're talking about preserving her status, I forget the language, but that language, I don't think any of these three issues have anything to do with her status as an employee. Those cases deal with, if I'm not mistaken, moving someone from, you know, from a CCN1 down to a janitor. Right. Down to a janitor. Moving them over to become a mechanic. That's not, that's just not the question that's being confronted in those cases. Now it's a question really of how we define employment status. I think so. Whether these three things can fit in it or not fit in it. Exactly. You have to figure out. And do you, what is, what cases do you think we should look at or what do you think is the best authority that suggests that things like these that she complains about don't relate to status? I think the cases that the appellant cites are fine. I mean, I will say that if, you know, if there had been a change in classification, if there had been a reduction in salary, although salary isn't the only indicia of status, if there had been a, you know, if we're moving, a perfect example, and I've had a case like this where a deputy sheriff has a seizure and is moved inside to work as a clerk. That's a change in status. That's a change in the employee status from a sworn deputy to an office worker, that kind of thing. Well, so there's, is there no reason. He could be moved inside to a sworn desk job. To a sworn desk job, yes. But, you know, I used the seizure incident. In fact, it was a case this Court decided some years ago because after a seizure, you're no longer qualified to be law enforcement. You can carry a weapon, drive the unit, and so forth. And I believe that that's what these cases are talking about. So if you, so here's the question, then. If you get, and I know you don't think this is her case, but let's just say, because we're trying to figure out what the law is providing. If you get transferred as a basis for, as a consequence of your accommodation, they transfer you to a job that you're not qualified to do. Does that, is that not an unreasonable accommodation? Well, let me try to answer it this way. I think it's an excellent question. If you are transferred to a job that you are not qualified to do, that tells me that you have had a change in your status as an employee. Because presumably your status as an employee are related in some way, to your qualifications and your training. Now, I suppose a case could come up where a physician is working as a mechanic and then because of a religious issue or some issue, gets transferred back to being a physician. That would clearly be a change in status, but I'm not sure it would be objectionable. But in that one, the person, who knows, maybe they pay him the same amount. But in that one, they're qualified for both jobs. Correct. Presumably. And I was going to go one step further. If that physician who's working as a mechanic was transferred to become a butcher, well, that's not, that clearly is not a reasonable accommodation, because he or she is not a butcher and has no training to be a butcher. But that's not what we have here. She's being moved from one nursing slot to another. And the only difference that existed was the shift. And because of the county's administrative processes and the pay differential, night shift people make more and, therefore, they are carried as CCN2s. The record reflects that there's, and it's murky on this, but the record reflects that. Is there any evidence that Ms. Kelly would not have been qualified to be hired at Orangewood in the first instance? None. None. She had all of the requisite degrees and other qualifications, certifications to be hired at Orangewood. Absolutely. Absolutely. The only evidence on that point is that, and it's not on that point, but one of the supervisors said I was a little bit reluctant because I don't like to transfer a problem from one agency to another. Mr. Watkins, now the exchange you've had with Judge McEwen comes down to the fact that maybe the issue here is whether or not the employee status was preserved by this accommodation, which is a separate issue from whether or not it was a religious accommodation or sufficiently accommodated the religious concern. This is what the American Postal Worker says about that issue. Now, this is on page seven, seven, seven. The determination of whether or not the employment status of the affected employee is reasonably preserved may be objectively assessed by the prior fact. Indicating it's a fact question for the jury. Well, it may it may be unless there's no evidence that would allow it to go to the jury. And here, here, the only arguments in their arguments that have been made are these three things, and I don't think they go to, as a matter of law, they don't go to status as an employee. That's our view on that. Now, of course, I don't think you get to that unless I'm wrong on, and Judge Hatter was wrong, on the directed verdict on the threshold question of whether or not she met the third prong of the discrimination test under Title VII. That is whether or not there was a threat or action taken against her because of her religion. And I don't mean to give up on that point at all. I do believe Judge Hatter made the correct call on that. I do believe that part and parcel of that analysis is whether or not a judge looking at the record as a whole believes that a reasonable juror or jury could find that the evidence preponderates in that regard. It's not just whether there is something in the record that we can hang our hat on. It has to be more than that. That's why it's referenced as substantial evidence. It has to be more than just something we can flag in the record and say, oh, there it is. A jury could run away with that. Well, that isn't always the case. And this is one of those cases where the record is so overwhelmingly demonstrative of performance issues that are undisputed, not even by the plaintiff's expert. I mean, she conceded from the stand that this was substandard performance from beginning to end. All right. I think we're starting to replow old ground. You've used up your time. All right. Thank you very much, Mr. Washington. Thank you. We'll hear rebuttal. Thank you, Your Honor. I would just like to briefly clarify that Your Honor is correct in honing in on the fact that Ms. Kelly does not concede that the transfer to Orangewood was a reasonable accommodation, although it did remove the requirement that she teach contraceptive use because the children there were so young. But the issue is whether it was a reasonable accommodation under Title VII. She presented evidence that it was not a reasonable accommodation because it didn't preserve her employment status. It was a setup. Now, the only way to conclude that she could have been hired, if she was qualified to be hired there in the first place. I'm not sure she was, Your Honor. Is there any, well, I guess the question, maybe I should phrase it differently. Is there evidence of the record to that effect one way or the other? There's evidence from Ms. Mosley at Volume III. Is this in front of the jury? Yes. I believe so. This is testimony at page 72 where Ms. Kelly's attorney questioned her and said, no, when she was transferred to the PM shift at Orangewood Children's Home, isn't it correct that she was the only CCN1 nurse working at that facility during the PM shift? And Ms. Mosley said, I don't know that for a fact. And then the trial lawyer asked her, have you ever seen any information to the contrary? And she said, no. Also, their own documentation about the CCN1 and CCN2 positions said that the two and three positions required a year of experience as a registered nurse in which you presumably would fulfill once you had probation. So there's no way to be hired initially as a two or a three unless you've been in the system someplace else and completed your probation. I believe that's true, Your Honor. Which she had not. So that wouldn't tend to show that she was not qualified. She wasn't qualified to be a two or a three, but it doesn't mean she's not qualified to be a nurse at Orangewood. I think it's a question for the jury, though, Your Honor. And respectfully, I think the only way that the Court can conclude that she was reasonably accommodated as a matter of law is to improperly resolve credibility issues against her. And so I would ask the Court not to allow that to happen and to send Ms. Kelly back for a trier of fact to determine whether she was accommodated or merely set up. All right. Thank you. We thank both counsel for your argument. This case is now submitted for decision. The next and the last case on the argument calendar is Carmona versus city of Costa Mesa. Good morning, Gregory Papp.
judges: Tashima, McKeown, Bybee